PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (619) 609-0860
Email: patrick@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NATEL ENGINEERING COMPANY, LLC, a California Limited Liability Company dba NEOTECH; and ONCORE MANUFACTURING, LLC, a California Limited Liability Company;<br><br>Defendants. | Civil Case No. **'23 CV 1888 DMS KSC**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.  JURISDICTION AND VENUE

1.  This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.  On July 27, 2023, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Natel Engineering Company, LLC dba NEOTech. ("NEO Tech") and Oncore Manufacturing, LLC ("Oncore") (collectively "Defendants") as the owners and/or operators of the Facility located at 237 Via Vera Cruz, San Marcos, California 92078 ("NEOTech Facility" or "Facility"), regarding their violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.  Plaintiffs mailed the Notice Letter to the Facility's physical address, 237 Via Vera Cruz, San Marcos, California 92078, to NEOTech's Agent for Service of Process, and to Oncore's Agent for Service of Process via certified mail.

4.  Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5.      More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.      Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

7.      Plaintiffs seek relief for Defendants' substantive and procedural violations of the IGP and the CWA resulting from its activities at the NEOTech Facility.

8.      Specifically, Defendants have discharged and continue to discharge polluted storm water from the NEOTech Facility to downstream waters and groundwater including San Marcos Creek, Lake San Marcos, Batiquitos Lagoons, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9.      Defendants have also violated and continue to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

10.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the NEOTech Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11.      Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12.      This discharge of polluted storm water and non-storm water from the

Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

13.    Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.    The polluted discharges from the NEOTech Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

### III.    PARTIES

15.    Natel Engineering Company, LLC is an active California Limited Liability Company doing business as NEOTech and is the Owner and/or Operator of the Facility.

16.    Oncore Manufacturing LLC is an active California Limited Liability Company and is the Owner and/or Operator of the Facility and enrolled under the IGP for the Facility in 2008.

17.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and

habitat degradation.

18.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

19.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

20.     Plaintiffs' members have an interest in accurate information about Defendants' discharges. Defendants' failure to accurately report and monitor impedes Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

21.     Defendants' failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendants' polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

22.     The violations of the IGP and CWA at the NEOTech Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendants' failure to comply with the IGP and the CWA.

23.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

24.     An actual controversy exists as to the rights and other legal relations

between Defendants and Plaintiffs.

## IV. LEGAL BACKGROUND

### A. The Clean Water Act.

25. The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

26. Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

27. "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

28. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

29. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

30. The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

31. The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

32. Private citizens may sue under the Clean Water Act to enforce the specific provisions of California's General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River*

*Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B.     California's IGP.**

33.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

34.     California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

35.     The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

36.     Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

37.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

38.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

39.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

/././

**C.      The IGP Discharge Prohibitions.**

40.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

41.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

42.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

43.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

44.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

45.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.      The IGP Effluent Limitations.**

46.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

47.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and

grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

48.    Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

49.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

50.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

51.    Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

**E.    The IGP Receiving Water Limitations.**

52.    The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

53.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

54.    The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained

in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

55. Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

56. WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

57. The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

58. The Beneficial Uses for San Marcos Creek, downstream from the Facility, include: agricultural water supply, water contact and non-contact water recreation, warm freshwater habitat, and wildlife habitat. Basin Plan, Table 2-2.

59. The Beneficial Uses for Lake San Marcos, downstream from the Facility, include: agricultural water supply, water contact and non-contact water recreation, warm freshwater habitat, and wildlife habitat. *Id.*, Table 2-2.

60. The Beneficial Uses for the Batiquitos Lagoon include: water contact and non-contact water recreation, preservation of biological habitats of significance, estuarine habitat, wildlife habitat, rare, threatened, or endangered species, marine habitat, migration of aquatic organisms, and spawning, reproduction and/or early development. *Id.*, Table 2-3.

61. Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

62. According to the 2020/2022 303(d) List, the San Marcos Creek is impaired for benthic community effects, bifenthrin, dichlorodiphenyldichloroethylene (DDE), indicator bacteria, nitrogen, phosphorus, pyrethroids, selenium, total dissolved solids,

1    toxicity.

2        63.    Polluted discharges from industrial facilities, such as the NEOTech Facility,

3    contribute to the degradation of these already-impaired surface waters, as well as aquatic-

4    dependent wildlife.

5        64.    The following WQS are established by the Basin Plan for the San Marcos

6    Creek and San Marcos Lake:  nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L;

7    pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-21; 3-46.

8        65.    Because the IGP Receiving Water Limitation prohibits discharges that cause

9    or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in

10   excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs,

11   absent any authorized mixing or dilution zone, are violations of Receiving Water

12   Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

13       **F.    The IGP Storm Water Pollution Prevention Plan Requirements.**

14       66.    Prior to beginning industrial activities, dischargers must develop and

15   implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

16       67.    The objectives of the SWPPP are to identify and evaluate sources of

17   pollutants associated with industrial activities that may affect the quality of storm water

18   discharges, to identify and implement site-specific BMPs to prevent the exposure of

19   pollutants to storm water, and to reduce or prevent the discharge of polluted storm water

20   from industrial facilities. *Id*. § X.

21       68.    The SWPPP must include, among other things: a narrative description and

22   summary of all industrial activity, potential sources of pollutants, and potential

23   pollutants; a site map indicating the storm water conveyance system, associated points of

24   discharge, direction of flow, areas of actual and potential pollutant contact, including the

25   extent of pollution-generating activities, nearby water bodies, and pollutant control

26   measures; a description of storm water management practices; a description of the BMPs

27   to be implemented to reduce or prevent pollutants in storm water discharges and

28   authorized non-storm water discharges; the identification and elimination of non-storm

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    10

water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id.* §§ X.A–I.

69.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

70.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id.* § XV.

### G.     The IGP Monitoring and Reporting Requirements.

71.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id.* §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

72.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

73.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

74.     A qualifying storm event ("QSE") is a precipitation event that produces a

discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

75.    The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

76.    Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

77.    Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

78.    Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

79.    Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

80.    Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

81.    Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

82.    All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for

1   accuracy. *Id*. § XXI.K.

2   **H.    The IGP Exceedance Response Actions Requirements.**

3   83.    The 2015 and 2020 Permits incorporate a "multiple objective performance

4   measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance

5   Response Actions ("ERAs"). 2015 Permit § I.M.61; 2020 Permit § I.N.75. The

6   NALs/TNALs consist of annual and instantaneous numeric thresholds for various

7   pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an

8   iterative process whereby the facility Owners and/or Operators must engage in specific

9   ERAs as required by the 2015 and 2020 Permits.

10   84.    When the 2015 Permit became effective on July 1, 2015, all permittees were

11   in "Baseline status" for all parameters listed in Table 2 of the Permit. 2015 & 2020

12   Permits § XII.B. A permittee's Baseline status for any given parameter changes to "Level

13   1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* §

14   XII.C. Level 1 status commences on July 1 following the Reporting Year during which

15   the exceedance(s) occurred, and the discharger enters the ERA iterative process. *Id*.

16   85.    The ERA process requires the discharger to conduct an evaluation, with the

17   assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial

18   pollutant sources at the facility that are or may be related to the NAL exceedance(s) by

19   October 1 following commencement of Level 1 status. *Id*. §§ XII.C.1.a–b. The evaluation

20   must include the identification of the corresponding BMPs in the SWPPP and any

21   additional BMPs and SWPPP revisions necessary to prevent future NAL/TNAL

22   exceedances and to comply with the requirements of the General Permit. *Id.* § XII.C.1.c.

23   Although the evaluation may focus on the drainage areas where the NAL/TNAL

24   exceedance(s) occurred, all drainage areas shall be evaluated. *Id*.

25   86.    Based upon this Level 1 status evaluation, the permittee is required to

26   prepare a Level 1 ERA Report no later than January 1 following commencement of Level

27   1 status. *Id*. § XII.C.2. The Level 1 Report must be prepared by a QISP and include a

28   summary of the Level 1 ERA evaluation and a detailed description of the SWPPP

revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. *Id.* §§ XII.C.2.a.i–ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id*.

## V.   **FACTUAL BACKGROUND**

### A.   **Facility Site Information, Industrial Activities, and Pollutant Sources.**

87.    The SMARTS database indicates Oncore first obtained IGP coverage to conduct industrial operations at the Facility on October 3, 2008, under Waste Discharge Identification ("WDID") Number 9 37I021859.

88.    The Facility's Standard Industrial Classification ("SIC") code is 3679 (Electronic Components), which requires Industrial General Permit coverage.

89.    According to the Facility's SWPPP, the facility occupies an 80,000 square foot building on 5.6 acres.

90.    According to its SWPPP, the following materials may be a source of contaminants at the Facility: diesel, solder (lead), fluxes and thinners, cryogenic nitrogen, gasoline, glycol coolant, oil and grease, fertilizer, soil erosion, and solder flux and thinner (alcohol). *See generally*, SWPPP.

91.    Plaintiffs are informed, believe, and thereon allege various industrial materials are also loaded and unloaded in multiple areas of the Facility.

92.    Plaintiffs are informed, believe, and thereon allege the Facility has an Air Pollution Control District permit for an on-site diesel generator located outdoors.

93.    The EPA has identified total suspended solids (TSS), oil and grease, acids, alkalinity, and heavy metals as pollutants which may be released from electronic and

electrical equipment and component facilities.[1]

94.     The Facility has multiple drainage areas. Plaintiffs are informed, believe, and thereon allege that the Facility drains from multiple discharge locations.

95.     Plaintiffs are informed, believe, and thereon allege that all discharges from the Facility flow into San Marcos Creek, the San Marcos Lake, Batiquitos Lagoon, and eventually to the Pacific Ocean.

96.     Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

97.     Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

98.     Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

99.     Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

100.     Plaintiffs are informed, believe, and thereon allege that even if regulated

---

[1] U.S. Environmental Protection Agency, *Electronic and Electrical Equipment and Components, Photographic, and Optical Goods Manufacturing Fact Sheet*, https://www.epa.gov/sites/default/files/2015-10/documents/sector_ac_elect_photo_op.pdf

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     15

1 industrial activities are not conducted at all locations throughout the entire Facility,
2 BMPs or other controls do not adequately separate the storm water flows from portions of
3 the Facility where non-regulated activities may occur from storm water flows from the
4 regulated industrial activities.

5      101.   Plaintiffs are informed, believe, and thereon allege that, due to both the
6 Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the
7 Facility where industrial activities are conducted commingles with storm water from
8 other areas of the Facility, and non-storm water commingles with storm water, and thus
9 all discharges from the Facility are regulated under the IGP.

10      102.   Plaintiffs are informed, believe, and thereon allege that industrial activities
11 at the Facility generate significant amounts of numerous pollutants. During rain events,
12 these pollutants are washed off surfaces throughout the facility and into storm water
13 discharge points, which flow to Receiving Waters.

14      103.   Plaintiffs are informed, believe, and thereon allege that Defendants have
15 failed and continue to fail to develop and/or implement required BMPs to prevent
16 discharges of all non-storm water in violation of the IGP and the Clean Water Act.

17      104.   Plaintiffs are informed, believe, and thereon allege that Defendants have
18 discharged and continue to discharge polluted storm water and non-storm water from the
19 Facility in violation of the IGP.

20      105.   Plaintiffs are informed, believe, and thereon allege that the Facility's
21 polluted discharges have caused and/or contributed, and continue to cause and/or
22 contribute, to the impairment of water quality in Receiving Waters in violation of the
23 IGP.

24      106.   Plaintiffs are informed, believe, and thereon allege that elevated levels of
25 numerous pollutants have resulted in the inability of Receiving Waters to support their
26 Beneficial Uses.

27      107.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges
28 of polluted storm water and non-storm water from the Facility impact Coastkeeper and

1   CERF's members' use and enjoyment of the Receiving Waters by degrading the quality

2   of those waters, and by posing risks to human health and aquatic life.

3   **B.    The Facility Discharges Contaminated Storm Water in Violation of the**

4   **IGP.**

5       108.   Plaintiffs are informed, believe, and thereon allege that with every

6   significant rain event, the Facility discharges polluted storm water via storm drainage

7   systems into the Receiving Waters.

8       109.   Plaintiffs are informed, believe, and thereon allege that the Receiving

9   Waters into which the Defendants discharge polluted storm water are waters of the

10  United States and therefore the IGP properly regulates discharges to those waters.

11      110.   Plaintiffs are informed, believe, and thereon allege that storm water and non-

12  storm water discharges from the Facility violate the Discharge Prohibitions and Effluent

13  Limitations of the IGP.

14      **1.    Discharges of Polluted Storm Water from the Facility Violate IGP**

15      **Discharge Prohibitions.**

16      111.   Plaintiffs are informed, believe, and thereon allege that the Facility has

17  discharged and continues to discharge numerous pollutants in concentrations that cause

18  or threaten to cause pollution, contamination, or nuisance in and around Receiving

19  Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

20      112.   The California Water Code defines "contamination" as "an impairment of

21  the quality of the waters of the state by waste to a degree which creates a hazard to the

22  public health through poisoning or through the spread of disease."

23      113.   "Pollution" is defined as "an alteration of the quality of the waters of the

24  state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial

25  uses."

26      114.   The Facility's own storm water monitoring data demonstrates the Facility

27  has discharged, and continues to discharge, concentrations of aluminum, iron, zinc, and

28  TSS in excess of various water quality objectives, benchmarks, and other standards which

were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1, Facility's Storm Water Monitoring Data. Plaintiffs are informed, believe, and thereon allege these polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

115. Plaintiffs are informed, believe, and thereon allege the Facility has discharged and continues to discharge unauthorized NSWDs in violation of IGP Discharge Prohibition III.B.

116. Plaintiffs are informed, believe, and thereon allege Defendants have violated and continue to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

117. Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

118. "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

119. Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

120. Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

121. As such, Plaintiffs are informed, believe, and thereon allege the Defendants have violated and continue to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San

Diego Basin Plan.

122.   The Facility's own storm water monitoring data shows numerous instances of concentrations of pH far below the respective Basin Plan water quality objectives. See, Ex. 1.

123.   Upon information and belief, the Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D. For example, the EPA Fact Sheet for Sector AC (Electronic and Electrical Equipment and Components, Photographic, and Optical Goods Manufacturing Facilities) specifically identifies numerous additional pollutants associated with facilities similar to the Facility, including organics, acids, Per- and polyfluoroalkyl substances (PFAS), and heavy metals.[2] The EPA has also documented releases to air and water from aerospace manufacturing facilities, including methanol, acid, trichloroethylene, methyl isobutyl ketone, 1-bromopropane, toluene, tetrachloroethylene, nickel, nitrate compounds, zinc, ammonia, and chromium.[3]

124.   The Facility has never sampled for these parameters. The discharge of iron and pH-affecting substances such as acid are governed by the San Diego Basin Plan water quality objectives, and chromium, copper, lead, and nickel (heavy metals) are all controlled by the CTR.

125.   Plaintiffs are informed, believe, and thereon allege the Facility also discharges these pollutants in excess of Basin Plan objectives and CTR criteria in violation of Discharge Prohibition III.D.

126.   Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.B–III.D of the Discharge Prohibitions provisions of the IGP is a

---

[2] https://www.epa.gov/sites/default/files/2015-10/documents/sector_ac_elect_photo_op.pdf

[3] https://epa.gov/system/files/documents/2022-02/aerospace-product-and-parts-manufacturing-and-maintenance_508.pdf

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     19

separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

127.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

128.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Discharge Prohibitions since at least July 27, 2018 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Exhibit 1 (setting forth dates of all precipitation events during the past five years).

**2.   Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.**

129.   Plaintiffs are informed, believe, and thereon allege that Defendants have failed and continue to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

130.   Visual observations of the Facility confirm that it lacks adequate BMPs.

131.   Plaintiffs are informed, believe, and thereon allege that BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Facility. Not only has the SWPPP remained unchanged and inadequate for almost a decade, City of San Marcos inspections noted litter throughout the Facility.

132.   On March 25, 2019, the City of San Marcos issued a Notice of Violation for failure to comply with minimum required stormwater control measures and BMPs. Accompanying the notice were photos documenting litter and debris, including plastic and cigarette butts, throughout the Facility. Indeed, the NOV and City inspection were the result of a complaint of an illicit and illegal discharge and littering at the Facility.

133.   Additionally, as reflected in the Facility's monitoring data, the Facility's pH is routinely at or below the applicable Basin Plan Water Quality Objective, indicating the BMPs are insufficient, and thus fail to achieve BAT/BCT.

134.   Each time Defendants discharge polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

135.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

136.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since at least July 27, 208 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.     Defendants Have Violated and Continue to Violate IGP SWPPP Requirements.**

137.   Plaintiffs are informed, believe, and thereon allege that Defendants have conducted and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

138.   Oncore submitted a SWPPP to SMARTS on June 11, 2015 and has never uploaded an amended or updated SWPPP to SMARTS since that time.

139.   Plaintiffs are informed, believe, and thereon allege that the Facility has not updated its SWPPP since June 11, 2015.

140.   Plaintiffs are informed, believe, and thereon allege that the Facility is currently operating without a valid SWPPP.

141.   Plaintiffs are informed, believe, and thereon allege the Facility SWPPP fails to contain BMPs that would prevent the exposure of pollutants to storm water, the comingling of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the IGP.

142.   For example, the Facility's SWPPP is dated October 8, 2014 and does not reflect the passage of the most recent Industrial Permit, which contains numerous new substantive SWPPP requirements.

143.    The 2014 SWPPP does not include: detailed information about its Pollution Prevention Team; the Facility's scheduled operating hours; an adequate description of potential pollutant sources; a description of the Facility's industrial processes, the type, quantity, and character; descriptions of each material handling and storage area; descriptions of industrial activities that generate significant amounts of dust or particulate, including PFAS; identification industrial activities associated with other permits, such as those from the Air Pollution Control District.

144.    The SWPPP also lacks: a description and evaluation of non-stormwater discharges, including the source, quantity, frequency, and characteristics, including drainage area and whether it is authorized or unauthorized; a description of the locations where soil may erode; an evaluation of all drains that identifies connections to the storm water conveyance system.

145.    The SWPPPP also erroneously identifies irrigation runoff as authorized storm water discharge though it is an unauthorized non-storm water discharge, as reflected in notices from the City of San Marcos.

146.    The SWPPP does not include an adequate pollutant source assessment. It fails to provide: an adequate description of areas with likely sources of pollutants in industrial storm water discharges; the approximate quantity, physical characteristics (e.g., liquid, powder, solid, etc.), and locations of each industrial material handled, produced, stored, recycled, or disposed; the degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water; the direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs; all sampling, visual observation, and inspection records; the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; and, the identification of the industrial pollutants related to the receiving waters with 303(d) listed impairments that may be causing or contributing to an

exceedance of a water quality standard in the receiving waters. IGP § X.G.2.a.i-ix.

147.   Because the Facility has not conducted the required pollutant assessment, the SWPPP does not include areas where minimum BMPS may not be adequate or where no exposure to industrial activities or materials occurs. IGP § X.G.2.b-c.

148.   The SWPPP also fails to acknowledge additional parameters, such as PFAS, metals, and nutrients, likely to be present in its industrial storm water. Id. § X.G.2.d. As such, the SWPPP has not been "developed, implemented, and revised as necessary to be consistent with any applicable municipal, state, and federal requirements that pertain to the requirements in this General Permit." IGP § X.D.2.a.

149.   The Facility's SWPPP and site map also fail to accurately reflect all drainage areas, discharge points, and flow direction as required by Section X.E of the IGP. For instance, the site map does not include:

- Notes, legends, a north arrow, and other data as appropriate to ensure the map is clear, legible and understandable. IGP § X.E.1.
- The facility boundary, storm water drainage areas within the facility boundary, and portions of any drainage area impacted by discharges from surrounding areas. Id. § X.E.3.a.
- Flow direction of each drainage area, on-facility surface water bodies, areas of soil erosion, and location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.) or municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized NSWDs. Id., § X.E.3.a.
- Locations of storm water collection and conveyance systems, associated discharge locations, and direction of flow. Id. § X.E.3.b.
- Sample locations if different than the identified discharge locations; Id. § X.E.3.b.
- Locations and descriptions of structural control measures that affect industrial storm water discharges, authorized NSWDs, and/or run-on; Id. § X.E.3.c.
- Identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures; Id. § X.E.3.d.

- Locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks (Section X.G.1.d) have occurred. Id. § X.E.3.e.
- Areas of industrial activity subject to the Permit. Id. § X.E.3.f.
- All industrial storage areas and storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and other areas of industrial activity that may have potential pollutant sources. Id. § X.E.3.f.

150.   As reflected in the City of San Marcos Notice of Violation and direct observations by CERF and Coastkeeper representatives, the Facility does not comply with the Permit's minimum BMP requirements. In May 2023, outdoor areas were observed with outdoor storage of shipping/receiving pallets, plastic wrapping, and litter near and around the outdoor trash areas.

151.   During a May 2023 rain event, Plaintiffs' representatives observed foamy discharges draining from the Facility and open trash receptacles, in violation of the IGP.

152.   Plaintiffs are informed, believe, and thereon allege identified BMPs are not being adequately implemented. For example, the Facility staff were unaware of the Facility's IGP enrollment for years and therefore, on information and belief, did not conduct the weekly and monthly inspections, personnel training, and sweeping identified in the SWPPP.

153.   Defendants have operated the Facility since at least July 27, 2018 without a valid SWPPP. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act.

154.   Defendants have been in daily and continuous violation of the IGP's SWPPP requirements since at least July 27, 2018.

155.   These violations are ongoing and Defendants are subject to civil penalties

1  for all violations of the Clean Water Act occurring since July 27, 2018.

2       **D.       Defendants Have Failed to Develop, Implement, and/or Revise an**

3               **Adequate Monitoring Implementation Plan at the NEOTech Facility.**

4       156.   Defendants have conducted and continue to conduct operations at the

5  Facility with an inadequately developed, implemented, and/or revised MIP.

6       157.   Defendants have failed and continue to fail to collect the required number of

7  storm water samples for each reporting period.

8       158.   The IGP requires Permittees to collect samples from two storm events within

9  the first half of each Reporting Year (July 1 to December 31), and from two storm events

10 within the second half of each Reporting Year (January 1 to June 30).

11      159.   Numerous QSEs and large storm events have occurred since July 27, 2018.

12 *See* Ex. 1, NOAA Precipitation Data.

13      160.   Defendants have failed and continue to fail to develop and/or implement a

14 MIP that requires the collection of storm water samples "from each drainage area at all

15 discharge locations" at the Facility in violation of Industrial General Permit. *See* 2015 &

16 2020 Permits § XI.B.4.

17      161.   While Section XI.C.4 of the Permit allow permittees to reduce the number of

18 locations to be sampled, there is no indication the Facility Owners and/or Operators have

19 complied with the requirements of Section XI.C.4 to justify sampling a reduced number

20 of discharge locations at the Facility.

21      162.   However, the Facility Owner and/or Operators have not collected samples

22 from the Facility since March 12, 2020. The Facility also failed to collect any samples

23 during the 2022/2023, 2021/2022, 2020/2021, and 2018/2019 reporting years.

24      163.   The Facility only obtained one sample during the first and second half of the

25 2019-2020 reporting year respectively.

26      164.   As such, Plaintiffs are informed, believe, and thereon allege the Facility's

27 failure to collect samples from "each drainage area at all discharge locations" is an

28 ongoing violation of the IGP. *See* 2015 & 2020 Permits § XI.B.4.

165.   Plaintiffs are informed, believe, and thereon allege the Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit.

166.   The Facility has similarly failed to test for pollutants related to the impairments of the Receiving Waters as required by Section XI.B.6.e of the IGP.

167.   Plaintiffs are informed, believe, and thereon allege the Defendants have failed and continue to fail to sample for pollutants that may contribute to Receiving Water impairments, such as nutrients, metals affecting toxicity (such as selenium, lead, chromium, copper, nickel, and manganese), and TDS. *See* 2015 & 2020 Permit § XI.B.6.e.

168.   The IGP requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Information available to Coastkeeper and CERF, including NeoTech's complete ignorance of the Permit, its terms, or of the Facility's enrollment thereunder, as well as the Facility's failure to collect the required number of storm water samples, indicates the NeoTech fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

169.   Plaintiffs are therefore informed, believe, and thereon allege Defendants have failed and continue to fail to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs required by the IGP.

170.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

171.   Plaintiffs are informed, believe, and thereon allege Defendants have been in daily and continuous violation of the IGP's MIP requirements since at least July 27, 2018.

172.   Plaintiffs are informed, believe, and thereon allege these violations are ongoing, and Defendants are subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least July 27, 2018.

**E.** **Defendant Has Violated the IGP's Exceedance Response Action Requirements.**

173. Defendant has failed and continues to fail to comply with multiple IGP ERA requirements.

174. The instantaneous NAL for pH is less than 6.0 or greater than 9.0.

175. The Facility's storm water sampled collected March 7, 2016 indicated a pH level of 5.88, and thus the Facility entered Level 1 for pH.

176. Despite entering Level 1 on July 1, 2016, Defendant has failed to complete a Level 1 ERA evaluation by October 1, 2016, in violation of Section XII.C.1 of the Permit. The Facility Owners and/or Operators further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2017. *See* 2015 & 2020 Permits § XII.C.2.

177. In fact, Defendant has failed to complete any Level 1 ERA reports to date, and therefore has violated and continues to violate all of the Permit's Level 1 ERA requirements.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

178. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

179. Plaintiffs are informed and believe, and thereon allege that Defendants have discharged and continue to discharge unauthorized non-storm water in violation of Section III.B of the IGP.

180. Plaintiffs are informed and believe, and thereon allege that Defendants have discharged and continue to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters

1    in violation of Section III.C of the IGP.

2        181.   Plaintiffs are informed and believe, and thereon allege that Defendants have

3    discharged and continue to discharge numerous pollutants in excess of water quality

4    objectives listed in the Basin Plan in violation of Section III.D of the IGP.

5        182.   Plaintiffs are informed and believe, and thereon allege that Defendants have

6    been in violation of the IGP Discharge Prohibitions at the Facility every day from at least

7    July 27, 2018 to the present. Plaintiffs are informed and believe, and thereon allege that

8    Defendants' violations of the IGP Discharge Prohibitions are ongoing and continuous.

9        183.   Each and every violation of the IGP Discharge Prohibitions is a separate and

10   distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the

11   acts and omissions alleged above, Defendants are subject to an assessment of civil

12   penalties for each and every violation of the CWA occurring from July 27, 2018 to the

13   present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365,

14   and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's
Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

19       184.   Plaintiffs incorporate the allegations contained in the above paragraphs as

20   though fully set forth herein.

21       185.   Plaintiffs are informed, believe, and thereon allege Defendants failed and

22   continue to fail to reduce or prevent pollutants associated with industrial activities from

23   discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

24       186.   Plaintiffs are informed and believe, and thereon allege, that discharges of

25   storm water containing levels of pollutants that do not achieve compliance with

26   BAT/BCT standards occur every time storm water discharges from the Facility.

27       187.   Defendants' failure to develop and/or implement BMPs that achieve the

28   pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of

the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

188.   Defendants violated and continue to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

189.   Plaintiffs are informed and believe, and thereon allege, that Defendants have been in violation of the IGP Effluent Limitations at the Facility every day from at least July 27, 2018 to the present. Plaintiffs are informed, believe, and thereon allege Defendants' violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendants will continue to be in violation of the IGP and the CWA each day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

190.   Each day that Defendants operate the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

191.   Each day that Defendants operate the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendants are subject to civil penalties for each and every violation of the CWA occurring since July 27, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

192.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

193.   Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to develop and/or implement adequate SWPPPs for the

Facility.

194.   Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to adequately revise the SWPPP for the Facility.

195.   Defendants conduct operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendants' failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

196.   Defendants have been in violation of the IGP SWPPP requirements at the Facility every day from at least July 27, 2018, to the present. Defendants' violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

197.   Defendants will continue to be in violation of the IGP and the CWA each day they fail to adequately develop, implement, and revise the Facility SWPPP.

198.   Each day Defendants operate the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendants are subject to civil penalties for each and every violation of the CWA occurring since July 27, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

199.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

200.   Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to develop and/or implement an adequate MIP for the Facility. Defendants operate the Facility each day without an adequately developed, implemented, and/or revised MIP.

201. Defendants' failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

202. Defendants have been in violation of the IGP MIP requirements every day from at least July 27, 2018, to the present. Defendants' violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

203. Defendants will continue to be in violation of the IGP and the CWA each and every day they fail to adequately develop, implement, and/or revise the Facility MIP.

204. Each day that Defendants operate the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring since July 27, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

205. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

206. Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

207. Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

208. Plaintiffs are informed and believe, and thereon allege that Defendants have

failed and continue to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

209.   Plaintiffs are informed and believe, and thereon allege that Defendants have failed and continue to fail to collect storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020 Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

210.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to comply with the IGP's monitoring requirements at the Facility since at least July 27, 2018. Defendants' violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

211.   Defendants will continue to be in violation of the IGP and the CWA each and every day they fail to comply with the IGP's monitoring requirements.

212.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring since July 27, 2018. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

213.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

214.   Defendants have failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

215.   Defendants' failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also*

1   33 U.S.C. § 1311(b).

2   216.   Defendants conduct operations at the Facility each day without reporting as

3   required by the IGP. Defendants have been in violation of the IGP's reporting

4   requirements every day since at least July 27, 2018. Defendants' violations of the

5   reporting requirements of the IGP and the CWA are ongoing and continuous.

6   217.   Defendants will continue to be in violation of the IGP and the CWA each

7   and every day it fails to comply with the IGP reporting requirements at the Facility.

8   218.   Each and every violation of the IGP reporting requirements is a separate and

9   distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the

10   acts and omissions alleged above, Defendants are subject to an assessment of civil

11   penalties for each and every violation of the CWA occurring since July 27, 2018. 33

12   U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

13   **SEVENTH CAUSE OF ACTION**

14   **Failure to Comply with ERA Requirements in Violation of the IGP and the Clean**

15   **Water Act.**
    **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

16

17   219.   Plaintiffs incorporate the allegations contained in the above paragraphs as

18   though fully set forth herein.

19   220.   Defendants have failed and continues to fail to conduct adequate Level 1

20   status evaluations requirements in violation of the IGP.

21   221.   Defendants have failed and continues to fail to submit adequate Level 1

22   ERA Reports fat the Facility in violation of the IGP. *See* 2015 & 2020 Permits § XII.C.2.

23   222.   Defendants conduct operations at the Facility each day without having

24   conducted an adequate Level 1 Evaluation, and/or submitting adequate Level 1 ERA

25   Reports, in violation of the IGP. *See* 2015 & 2020 Permit §§ XII.C–D.

26   223.   These violations are ongoing and continuous, and the Facility will continue

27   to be in violation of the IGP and the CWA each and every day Defendants fail to comply

28   with the Level 1 ERA requirements at the Facility.

224.    Every day Defendant conducts operations at the Facility without conducting an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Report is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

225.    Defendant has been in daily and continuous violation of the IGP's Level 1 status ERA evaluation requirement every day since October 1, 2016.

226.    Defendant has been in daily and continuous violation of the IGP for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017.

227.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 1, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d), 1365, and 40 C.F.R. § 19.4.

228.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

229.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VII.    RELIEF REQUESTED

230.    Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendants have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth

1  within this Complaint;

2      b.    A court order enjoining Defendants from discharging pollutants from the

3  Facility to surface waters in violation of the Clean Water Act and IGP;

4      c.    A court order requiring Defendants to implement affirmative injunctive

5  measures designed to eliminate Defendants' violations of the substantive and procedural

6  requirements of the IGP and the Clean Water Act;

7      d.    A court order assessing civil monetary penalties for each violation of the

8  CWA at $64,618 per day per violation for violations that occurred after November 2,

9  2015 and assessed on or after January 6, 2023, as permitted by CWA Section 309(d), 33

10  U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40

11  C.F.R. § 19.4.

12      e.    A court order awarding Plaintiffs their reasonable costs of suit, including

13  attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

14  Water Act, 33 U.S.C. § 1365(d); and

15      f.    Any other relief as this Court may deem appropriate.

16  Dated: October 16, 2023

17  Respectfully submitted,

18  COAST LAW GROUP LLP

19  By: s/Livia B. Beaudin

20  LIVIA B. BEAUDIN
   Attorney for Plaintiffs

21  COASTAL ENVIRONMENTAL
   RIGHTS FOUNDATION

22  E-mail: livia@coastlawgroup.com

24  SAN DIEGO COASTKEEPER

25  By: s/Patrick McDonough

26  PATRICK MCDONOUGH
   Attorney for Plaintiffs

27  SAN DIEGO COASTKEEPER

28  E-mail: patrick@sdcoastkeeper.org